IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ELLIOTT CONE and NANCY CONE, )
individually and )
on behalf of ELLIOTT )
HAMILTON CONE, III, )
 )
    Plaintiffs, )
 )
    v. )       1:06CV00579
 )
RANDOLPH COUNTY SCHOOLS BOARD )
OF EDUCATION, )
 )
    Defendant. )

OSTEEN, District Judge

    This matter came on to be heard by the undersigned United States District Judge on August 25, 2006, upon Plaintiffs' Motion for "Stay Put" Order or, in the Alternative, for Preliminary Injunction. After examining the parties' filings and hearing arguments from counsel, the court makes the following findings of fact, conclusions of law, and order.

### FINDINGS OF FACT

    1. Plaintiffs Elliott and Nancy Cone, residents of Randolph County, North Carolina, are the parents of Elliott Hamilton Cone, III ("Elliott"), a severely disabled sixteen-year-old boy who has been diagnosed with various conditions including Fragile X Syndrome, autism, and severe to profound mental retardation.

    2. Elliott has been identified as eligible to receive special education and related services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.

(2006), and he has received such services from Defendant Randolph County Schools ("RCS") at various times since 1993. The history of Elliott's placements prior to the year 2000 is set forth in this court's earlier decision in Cone v. Randolph County Schs., 302 F. Supp. 2d 500, 504-05 (M.D.N.C. 2004).

3. In both 2000 and 2001, pursuant to IDEA, an Individualized Education Plan ("IEP") was developed for Elliott placing him in a residential program at the Benedictine School for Exceptional Children ("Benedictine") in Ridgely, Maryland. The placement emerged from an agreement between RCS and the state mental health agency that no placement in North Carolina was suitable for Elliott. Pursuant to this agreement, RCS paid the educational portion of Elliott's expenses at Benedictine, while the mental health agency funded the residential portion.

4. In the spring of 2001, state mental health officials requested that RCS investigate a potential in-state placement for Elliott, Partners in Austism Treatment and Habilitation ("PATH"), a residential facility at the Murdoch Center in Butner, North Carolina. In July 2001, after gathering information about PATH and holding a series of IEP meetings, RCS amended Elliott's IEP by changing his placement to PATH.

5. Plaintiffs challenged the placement change through the administrative process in North Carolina and then in this court. Affirming the state review officer's decision, this court concluded that placing Elliott at PATH provided him with a "free appropriate public education" ("FAPE") as required by IDEA.

Cone, 202 F. Supp. 2d at 512.  On appeal, the Fourth Circuit affirmed this court's decision, 103 Fed. Appx. 731 (4th Cir. 2004), and the Supreme Court denied certiorari, 543 U.S. 1124, 125 S. Ct. 1077 (2005).

    6.  During the proceedings, Elliott remained at Benedictine pursuant to the "stay put" provision of IDEA.  See 20 U.S.C. § 1415(j) (2006).  Because the proceedings were still pending in 2004, an IEP was created in May 2004 that maintained Elliott's "stay put" placement at Benedictine for another year.

    7.  Following the denial of certiorari in January 2005, RCS began attempting to implement the PATH placement.  Placement at PATH requires the local mental health agency to compile and submit application materials, including a section completed by the parents, on the applicant's behalf.  In March 2005, RCS sent Plaintiffs a PATH application form and asked that they initiate the process with Sandhills Center for Mental Health, Developmental Disabilities and Substance Abuse Services ("Sandhills Center").  In April 2005, RCS again wrote to Plaintiffs, through their attorney, notifying them of RCS' intent to move forward with the PATH placement and requesting that Plaintiffs complete their portion of the application.

    8.  An IEP meeting was held in late April 2005 to address the PATH placement.  At the meeting, RCS proposed an IEP to continue Elliott's placement at Benedictine until placement at PATH could be implemented.  Plaintiffs argued that Benedictine was an appropriate placement and that they would not allow

Elliott to attend PATH.  The lengthy meeting adjourned with apparent agreement that the IEP would at least provide for placement at Benedictine pending PATH placement.  However, neither party signed the proposed IEP document, and the parties did not address extended school year ("ESY") services or Elliott's transition from Benedictine to PATH.

    9.  On May 3, 2005, RCS sent a copy of the proposed IEP to Plaintiffs but received no response.  Meanwhile, Plaintiffs made no known efforts to initiate the PATH application process, and the parties held no follow-up IEP meeting to address the unresolved issues.  On May 26, 2005, Donna Rascoe, RCS' attorney, wrote to Plaintiffs, through their attorney, informing them that because they had not cooperated with attempts to implement the PATH placement, RCS' payment for Benedictine would end on May 5, 2005, at the expiration of the last IEP created under "stay put."

    10.  Plaintiffs did not respond to the May 26 letter, nor did they sign the May 2005 IEP.  Plaintiffs insist they did not receive the May 26 letter until mid-July 2005 due to communication problems with their then-attorney.  This attorney testified that she both emailed Plaintiffs and had a conference call with them within two weeks of the May 26 letter being sent.  Nevertheless, Plaintiffs chose to allow Elliott to continue at Benedictine for the rest of the 2004-05 school year, for ESY services in July 2005, and for the beginning of the 2005-06 school year.

4

11.   In response to the May 26 letter, Plaintiffs requested mediation with the North Carolina Department of Public Instruction in July 2005 and made requests for another IEP meeting in late July and early August 2005.  No IEP meeting was scheduled pending the outcome of the mediation, at which parties did not reach an agreement.  During discussions in July and August 2005, RCS requested Elliott's PATH application, but Plaintiffs refused to provide it.  As of late July, Sandhills Center still had to gather many items for the application, and Plaintiffs had not completed their portion which they had received in March 2005.

12.   In September 2005, the parties agreed to re-initiate IEP meetings, because Elliott would soon return to Randolph County from Benedictine.  After considering input from various sources, including Benedictine staff, RCS proposed changing Elliott's placement to a self-contained classroom at Trinity High School ("Trinity") in Randolph County.  Plaintiffs objected to the proposed change, refused to sign the document, and insisted that Elliott be placed at Benedictine.  Plaintiffs again refused to furnish a copy of the PATH application or provide information regarding the status of their application, and thus, placement at PATH was not included in the proposed IEP.  On October 10, RCS became the only party to agree to and sign the IEP.

13.   After the October 10 meeting, RCS officials prepared for Elliott's arrival at Trinity by making adjustments to the classroom and developing transition plans.  Plaintiffs enrolled

5

Elliott at Trinity on October 31, 2005, but they removed him after only seven days and before he completed his transition. While Elliott was at Trinity, he had several behavioral incidents both at school and when traveling to and from school, but overall he appeared to adapt as expected to the transition. After being removed from Trinity, Elliott remained without formal educational services until the summer of 2006.

14. Much of any decline Elliott may have experienced since leaving Benedictine can be attributed to the expected difficulty making a transition from one environment to another and to his lengthy absence from all educational services.

15. Although RCS had begun requesting that Plaintiffs begin the PATH application process as early as March 2005, neither Plaintiffs nor Sandhills Center indicated that they had begun working on the application until July 2005. Furthermore, Sandhills Center did not submit the application to PATH until September 14, 2005, at which time required materials were omitted and Plaintiffs' portion was incomplete. Plaintiffs attached a plea to their part of the application requesting that Elliott not be accepted. In response to the incomplete application, the Director of the Murdoch Center repeatedly asked Plaintiffs to indicate whether they were truly applying to PATH. Plaintiffs did not provide such a statement until January 18, 2006. The following day Elliott was placed on the waiting list at PATH. By waiting nearly four months to begin the process, not promptly completing their portion, and delaying the process four

6

additional months due to an incomplete application, Plaintiffs deliberately delayed the PATH application process so that Elliott could remain at Benedictine. No space has yet become available at PATH, and Elliott remains on the waiting list.

16. On October 11, 2005, the day after RCS signed the October 2005 IEP, Plaintiffs requested a due process hearing in the North Carolina Office of Administrative Hearings to challenge the October 2005 IEP and Elliott's placement at Trinity. Plaintiffs also requested an emergency order requiring "stay put" placement at Benedictine during the proceedings. After a hearing on the "stay put" issue, Chief Administrative Law Judge ("ALJ") Julian Mann, III denied Plaintiffs' request, finding that Elliott had no current educational placement for "stay put" purposes at the time the request was filed.

17. In conducting the due process hearing, ALJ Beecher R. Gray overturned Judge Mann's ruling and found that Elliott's "stay put" placement was at Benedictine pending acceptance at PATH pursuant to the May 2005 IEP. ALJ Gray also found that the October 2005 IEP and placement at Trinity did not provide Elliott with FAPE. Judge Gray ordered that RCS sign the May 2005 IEP, place Elliott at Benedictine under the IEP, and continue to pay the expenses for Benedictine until a space is available at PATH.

18. RCS appealed Judge Gray's decision, and state review officer ("SRO") Joe Walters reviewed the findings. SRO Walters found that Elliott's prior "stay put" placement at Benedictine had ended by the end of July 2005 due to Plaintiffs' deliberate

7

efforts to delay Elliott's placement at PATH. As such, he concluded that RCS had a duty to pay for Elliott's expenses at Benedictine only through July 2005 and that Elliott had no current educational placement when Plaintiffs initiated these proceedings. Finally, SRO Walters found that the October 2005 IEP and placement at Trinity did not provide Elliott with FAPE.

## **CONCLUSIONS OF LAW**

Based upon the foregoing Findings of Fact, the court concludes as a matter of law that:

1. Elliott is a child with special needs and is entitled to FAPE pursuant to IDEA. See 20 U.S.C. § 1400 et seq. (2006).

2. The pendent placement or "stay put" provision of IDEA seeks to ensure that while a dispute regarding a child's placement is ongoing, the child's existing placement is not disturbed. Bd. of Educ. of Montgomery County v. Brett Y., 959 F. Supp. 705, 708-09 (D. Md. 1997). The provision provides in relevant part that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. § 1415(j) (2006).

3. District courts reviewing IDEA cases must give "due weight" to the proceedings below but also make an independent decision based on the evidence presented. Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 205-06, 102 S. Ct. 3034, 3050-51 (1982).

8

4. The burden of proof on review of an IDEA case rests upon the party challenging the administrative ruling. <u>Barnett v. Fairfax County Sch. Bd.</u>, 927 F.2d 146, 152 (4th Cir. 1991).

5. During the prior litigation over the appropriateness of PATH, Elliott's "stay put" placement was at Benedictine. When the litigation ended in January 2006, Elliott's "stay put" placement was to continue at Benedictine until the parties could implement this court's decision by placing Elliott at PATH.

6. Pursuant to "stay put," the May 2004 IEP placed Elliott at Benedictine for the 2004-05 school year. As clearly stated in the IEP document, the IEP expired in May 2005. Subsequently, RCS appropriately began developing an IEP that would facilitate implementation of this court's decision to place Elliott at PATH.

7. The May 2005 proposed IEP specified that Elliott's placement would continue at Benedictine until his PATH placement could be implemented. Plaintiffs have not shown that the parties reached a consensus on this proposed placement in light of Plaintiffs' outright refusal at the meeting to send Elliott to PATH, both parties' failure to sign the IEP document, and the issues left unresolved at the meeting. Therefore, the May 2005 IEP may not have become operative and as such would not control Elliott's placement for "stay put" purposes.

8. If the May 2005 IEP had been implemented, Plaintiffs' actions eventually would have caused the IEP to become inoperative and Benedictine to no longer be Elliott's "stay put" placement. Plaintiffs intentionally delayed the PATH placement

9

by failing to begin work on the application until July 2005, four months after RCS first asked them to do so. Once they began the process, Plaintiffs further delayed it by submitting their portion of the application incomplete, attaching a plea that Elliott not be accepted, and waiting months to assure PATH that they were truly applying. Plaintiffs' deliberate steps to delay execution of FAPE eventually converted Benedictine from Elliott's "stay put" placement to a private placement chosen unilaterally by Plaintiffs. Allowing Plaintiffs perpetual private school funding under "stay put" despite their actions would be "contrary to the spirit of IDEA" and would provide an incentive for them to continue resisting a court-approved FAPE. See Mayo v. Baltimore City Pub. Schs., 40 F. Supp. 2d 331, 334 (D. Md. 1999).

9. Plaintiffs' refusal to cooperate with implementation of the PATH placement also constituted a refusal to consent to receive special education and related services under IDEA. When parents refuse to consent to such services, the school district no longer has an obligation to provide FAPE to the child. 20 U.S.C. § 1414(a)(1)(D)(ii)(II) (2006). The school system must notify the parents of a change in placement before the parents' actions can be considered refusal to consent, § 1415(b)(3)(A), but RCS notified Plaintiffs in March, April, and May 2005 that it wished to move forward with the PATH placement. Plaintiffs then had the remainder of the 2004-05 school year and the summer to consent to RCS' services by moving forward with the PATH placement. Because they did not consent, RCS was relieved of its

10

duty to provide FAPE.  As such, Elliott's "stay put" placement at Benedictine expired at the end of July 2005.

10.  Under the "stay put" provision, the child's then-current educational placement remains the child's placement throughout litigation unless the parents and the state or school district agree otherwise.  § 1415(j).  An administrative decision in favor of a child's parents can constitute an agreement for "stay put" purposes.  Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 372, 105 S. Ct. 1996, 2004 (1985).  Once such an administrative decision is reached, that placement typically becomes the child's pendent placement.  See Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 83-84 (3d Cir. 1996); Brett Y., 959 F. Supp. at 713.  However, North Carolina has a modified two-tiered system for administrative challenges under IDEA, both tiers of which are conducted by the state.  Wittenburg v. Winston-Salem/Forsyth County Bd. of Educ., No. 05-818, 2006 U.S. Dist. LEXIS 63812, at * 15-16 (M.D.N.C. Sept. 1, 2006).[1]  An ALJ first conducts a hearing, and then either party can appeal the case to a state review officer ("SRO").  See id. at 3, 16-17.  Conducting both the hearing and appeal at the state level creates the possibility of conflicting opinions from one entity.  Id. at 17.  Because one decision has to be the official position of the state agency for agreement purposes, if there is an appeal, the

---

[1]  While the court generally prefers not to cite unpublished opinions, the holding of this case directly addresses the issue at hand such that it warrants mentioning the case as additional support for this court's decision.

11

SRO's decision controls.  Id. at 17-18.  In this case, the SRO overruled the ALJ's decision in favor of the parents regarding "stay put" placement.  Therefore, the ALJ's decision cannot be construed as an agreement on pendent placement.

   11.  Because Plaintiffs unilaterally chose Benedictine as a private placement for Elliott, refused consent to educational services by intentionally delaying the PATH application process, and made no agreement with the state as to pendent placement, Elliott had no "stay put" placement by the end of July 2005.

   12.  The current dispute arose on October 11, 2005, when Plaintiffs filed their petition for a due process hearing.  Although RCS had developed a new IEP for Elliott the day before the proceedings were filed, Plaintiffs had not agreed to the IEP, and it had not yet been implemented.  In fact, the appropriateness of the October 2005 IEP and placement under it are the subjects of this dispute.

   13.  The then-current educational placement for "stay put" purposes is usually the child's placement immediately before the placement being challenged.  See Susquenita, 96 F.3d at 83; Brett Y., 959 F. Supp. at 709 (noting that current placement should be the placement actually functioning at the time "stay put" is invoked).  Because Elliott's October 2005 IEP and placement had not yet been implemented when "stay put" was invoked and Trinity is the challenged placement, Trinity is not Elliott's then-current educational placement.  The placement immediately before Trinity was Benedictine, but as of the end of July 2005,

12

Benedictine was no longer Elliott's placement under IDEA. At the time the current proceedings were filed, Elliott had no functioning placement. Without a current placement to which "stay put" can apply, this court cannot enter a "stay put" order.

14. Plaintiffs have not met their burden of proving, in the alternative, that they are entitled to a preliminary injunction placing Elliott at Benedictine pending space availability at PATH. "[P]reliminary injunctions are extraordinary interlocutory remedies that are granted in limited circumstances [including preserving the status quo and preventing irreparable harm] and then only sparingly." Sun Microsystems, Inc. v. Microsoft Corp., 333 F.3d 517, 526 (4th Cir. 2003).

15. In this case, Plaintiffs seek a mandatory injunction requiring RCS to place Elliott at Benedictine. Instead of merely preserving the status quo, a mandatory injunction requires affirmative action. As such, it 'should be granted only . . . when the exigencies of the situation demand such relief.' Id. (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)). To grant a mandatory injunction, the relief must be necessary to protect against irreparable harm to the plaintiff due to circumstances created by the defendant and to maintain the court's ability to enter final relief on the merits. Id. If this need is not shown, then the court should not consider granting the mandatory injunction. Id. Once this showing is made, the factors to consider in determining whether to grant a preliminary injunction are the likelihood of harm to the

13

plaintiff if the motion is denied, the likelihood of harm to the defendant if the motion is granted, the plaintiff's likelihood of success on the merits, and the public interest.  <u>Safety-Kleen, Inc. v. Wyche</u>, 274 F.3d 846, 858-59 (4th Cir. 2001).

    16.   Plaintiffs have not shown that a mandatory injunction is necessary.  First, Plaintiffs have failed to demonstrate that Elliott will suffer irreparable harm caused by RCS if the injunction is denied.  Benedictine has not been Elliott's placement for over a year, and any decline he has experienced is attributable to being without any educational services for such a lengthy period rather than to not being at Benedictine.  Reports from educators show that as of July 2006, Elliott was able to participate in educational activities with some success, further indicating that being away from Benedictine is not causing him irreparable harm.  Moreover, RCS is not the cause of any harm Elliott may experience during these proceedings.  While RCS did terminate funding for Benedictine, they did so because Plaintiffs had refused to consent to or cooperate with implementation of the PATH placement.  RCS even developed an alternate placement for Elliott once he returned from Benedictine, but Plaintiffs removed him from that placement and have since kept him removed from all educational services.  Therefore, Plaintiffs have not shown that RCS created a situation that will cause Elliott to suffer irreparable harm if their motion is denied.

    17.   Second, if the mandatory injunction is denied, this court will not lose its ability to grant ultimate relief on the

14

merits. In this action, Plaintiffs challenge the October 2005 IEP and placement at Trinity. Elliott remained in that placement only seven days, and Plaintiffs removed him from it nearly one year ago. Denying a preliminary injunction ordering Elliott to be placed at Benedictine during these proceedings would in no way affect the court's ability to grant Plaintiffs relief from the 2005 IEP and placement at Trinity.

18. Plaintiffs have failed to demonstrate that a mandatory injunction is necessary to prevent Elliott from suffering irreparable harm or to preserve the court's ability to grant relief on the merits. Because Plaintiffs have not met this threshold standard, the court must deny the motion rather than to consider the balancing factors.

## ORDER

IT IS THEREFORE ORDERED THAT Plaintiffs' Motion for "Stay Put" Order or, in the Alternative, for Preliminary Injunction [6] is DENIED.

This the 20th day of October 2006.

/s/ William L. Osteen
United States District Judge