IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ELLIOTT CONE and NANCY CONE,      )
Individually and on behalf of    )
ELLIOTT HAMILTON CONE, III,       )
                                  )
              Plaintiffs,         )
                                  )
      v.                          )      1:06cv00579
                                  )
RANDOLPH COUNTY SCHOOLS           )
BOARD OF EDUCATION,               )
                                  )
              Defendant.          )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

       This is an action brought pursuant to the provisions of the
Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.
§ 1400 et seq.  Plaintiffs Elliott and Nancy Cone (the "Cones")
allege that Defendant Randolph County Schools Board of Education
("RCS") failed to provide an appropriate placement for their
son, Elliott Hamilton Cone, III ("Elliott").  (Doc. 1.)  Before
the court are cross motions for summary judgment; the Cones seek
recovery of tuition costs and attorneys' fees, and RCS seeks a
ruling that it complied with law in providing placement for
Elliott.[1]  (Docs. 31 & 33.)  For the reasons set forth below, the
motions are granted in part and denied in part.

───────────────

[1] The parties' cross motions for summary judgment fail to list specific
grounds, as required by local rule 7.3, but rely rather on the grounds
set forth in their briefing and seek summary adjudication of all

I.  **FACTS**

A.  **Statutory Framework**

Congress enacted the initial version of the IDEA in 1970 to ensure that all children with disabilities were provided "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected." Forest Grove Sch. Dist. v. T.A., 129 S. Ct. 2484, 2491, 2009 WL 1738644, at *6 (2009) (internal quotation marks and citation omitted; brackets in original). All states receiving federal education funds are required to provide disabled school children with such "free appropriate public education" ("FAPE"), which "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." M.S. v. Fairfax County Sch. Bd., 553 F.3d 315, 319 (4th Cir. 2009) (quoting Bd. of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982)); see 20 U.S.C. § 1412(a)(1)(A).

Schools provide a particular student with a FAPE through an Individualized Education Plan ("IEP").  An IEP "must contain

remaining claims on the administrative record, as supplemented by the Cones in this litigation.  Thus, the court treats the motions as seeking resolution of all claims in the case.

statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." MM ex rel. DM v. Sch. Dist. of Greenville County, 303 F.3d 523, 527 (4th Cir. 2002); see 20 U.S.C. § 1414(d)(1)(A). An IEP must ultimately be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207.

States receiving IDEA funds must also "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." 20 U.S.C. § 1415(a). If a parent objects to the identification, placement, or evaluation of his or her child, the state must provide a due process hearing. Id. § 1415(f)(1). At that hearing, the parent has the right to be accompanied by counsel, to present evidence and cross-examine witnesses, and to receive a written record of the hearing and the decision made. Id. § 1415(h)(1)-(4).

North Carolina employs a two-tiered administrative review system. The due process hearing is carried out by a hearing officer, an administrative law judge ("ALJ") selected by the North Carolina Office of Administrative Hearings. Parties aggrieved by the findings of the ALJ may appeal to the State

Board of Education, which will appoint a state review officer knowledgeable about special education ("SRO") to review the ALJ's findings and decision.[2]  After the state level appeals process is exhausted, an aggrieved party may seek further review by bringing an action in a federal district court.  20 U.S.C. § 1415(i)(2)(A).

Federal courts apply a two-step inquiry in reviewing a state administrative proceeding in an IDEA case.  First, the district court must decide whether the state complied with the IDEA's procedural requirements.  Rowley, 458 U.S. at 206; Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1206 (4th Cir. 1990) (holding that a state's failure to comply with the IDEA's procedural requirements can be adequate grounds to conclude that a school district failed to provide a FAPE).  Second, the court must decide whether the substance of the IEP is "reasonably calculated" to enable the child to receive educational benefits. Rowley, 458 U.S. at 206-07.  If both requirements are met, "the State has complied with the obligations imposed by Congress and the courts can require no more."  Id. at 207.

---

[2]  The ALJ and SRO acted pursuant to N.C. Gen. Stat. §§ 115C-116(d)-(h) and 115C-116(i), respectively.  Those provisions were repealed by N.C. Sess. L. 2006-69, § 1, effective July 10, 2006, although the new law is not effectively different.  Under then applicable law, on appeal of an ALJ's decision the State Superintendent of Public Instruction appoints an SRO "from a pool of review officers approved by the State Board of Education."  N.C. Gen. Stat. § 115C-116(i) (repealed by N.C. Sess. L. 2006-69, § 1, effective July 10, 2006).  The SRO is "an educator or other professional who is knowledgeable about special education."  Id.

**B.    The Cones' Litigation**

The parties have been litigating the appropriate educational placement for Elliott since 2001.    See Cone ex rel. Cone v. Randolph County Sch., 302 F. Supp. 2d 500 (M.D.N.C. 2004), aff'd, 103 F. App'x 731 (4th Cir. 2004).    The history of Elliott's illness and RCS' provision of services is detailed in this court's prior opinion.    See Cone, 302 F. Supp. 2d at 504-05.    In short, Elliott suffers from Fragile X Syndrome and autism and has been diagnosed with, among other conditions, severe to profound mental retardation.    RCS began providing him with special education services in 1993 through various facilities both within and without the state of North Carolina.

The Cones' previous lawsuit challenged RCS' decision to amend Elliott's IEP in July 2001.    At the time, Elliott was enrolled at the Benedictine School for Exceptional Children ("Benedictine") in Ridgeley, Maryland, under an IEP developed by RCS.    In July 2001, over the Cones' objection, RCS amended Elliott's IEP to place him at the Partners in Autism Treatment and Habilitation ("PATH") program, an in-state residential program located at the Murdoch Center in Butner, North Carolina. The Cones challenged the change through the administrative process.    The ALJ concluded that PATH did not provide an

5

appropriate placement for Elliott, but the SRO reversed. The
Cones filed suit in this court, and on February 6, 2004, Judge
Osteen, Sr., held that RCS complied with the IDEA and could
provide Elliott a FAPE through PATH. Cone, 302 F. Supp. 2d at
512. That holding was affirmed on appeal, Cone v. Randolph
County Sch., 103 F. App'x 731 (4th Cir. 2004), and the Supreme
Court denied certiorari on January 24, 2005, Cone v. Randolph
County Sch., 543 U.S. 1124 (2005), effectively putting that
litigation to an end.

At the time the Cones' litigation terminated, Elliott
resided at Benedictine pursuant to an IEP effective from May 7,
2004 to May 5, 2005. The IEP had been instituted under the
IDEA's "stay put" provision, which permits a child to "remain in
the then-current educational placement" during the pendency of
IDEA litigation. 20 U.S.C. § 1415(j)[3]; Cone, 302 F. Supp. 2d at
505 n.1. To facilitate this court's February 6, 2004, decision,
RCS sent the Cones in March 2005 an application for Elliott's
admission to PATH. On April 28, 2005, an IEP meeting was
convened to discuss Elliott's transition and placement at PATH.[4]

---

[3] Although the IDEA was amended effective July 1, 2005, by the
Individuals with Disabilities Education Improvement Act of 2004, Pub.
L. 108-446, 118 Stat. 2647, 2725-26, this provision remained
unchanged.

[4] The hearing testimony and the SRO's decision reflect that the
meeting took place on April 28, 2005. (Administrative Record
("A.R."), Tr. at 1154, 2414; Doc. 1, Ex. 1-2 at 6.) The ALJ's
reference to an April 27, 2005, date (Doc. 1, Ex. 1-3 at 6) appears to
be a typographical error.

By the end of the meeting, a draft IEP ("April IEP") had been compiled but was not finalized. Notably, it listed placement as "Benedictine/PATH." Attempts to finalize the April IEP were unsuccessful.

On May 3, 2005, RCS sent the April IEP to the Cones' attorney, along with a request for consent to release certain information to facilitate Elliott's application to PATH.[5] (A.R., Respondent's Ex. 6.) The Cones did not respond to this letter in writing. On May 26, 2005, RCS wrote the Cones' attorney reiterating that, because their litigation had ended with the U.S. Supreme Court's denial of the petition for writ of certiorari, Elliott's stay put placement at Benedictine ended. RCS further stated that RCS' "payment for Benedictine will end concurrent with the end of the last IEP under stay put (May 5, 2005)." (A.R., Respondent's Ex. 7.) RCS terminated payments to Benedictine effective May 6, 2005.

Elliott remained at Benedictine through mid-June 2005 to complete the school year and returned for the Extended Summer Year ("ESY") session during the month of July 2005.

Throughout the summer of 2005, the parties communicated sporadically regarding finalizing the April IEP, but no meeting

---

[5]  The admission process for PATH is administered by the Sandhills Center for Mental Health Developmental Disabilities and Substance Abuse Services ("Sandhills") and requires parents of children seeking enrollment to complete an application and submit supporting materials directly to Sandhills.

was convened. The Cones finally requested mediation through the North Carolina Department of Public Instruction. Yet an August 30, 2005, mediation failed to produce an agreement.

The Cones returned Elliott to Benedictine in September 2005, at the beginning of the 2005-06 school year. At that time the April IEP remained unsigned, the last IEP had expired (on May 6, 2005), and the Cones had failed to submit a PATH application.

The Cones eventually submitted a PATH application on September 14, 2005. (A.R., Petitioner's Ex. 19; Respondent's Exs. 19, 24.) However, they attached a thirteen-page letter detailing reasons why they believed Elliott should be allowed to remain at Benedictine and discouraging admission to PATH. (A.R., Petitioner's Ex. 19; A.R., Respondent's Ex. 19.)

On September 28, 2005, the parties convened an IEP meeting. RCS presented a draft IEP proposing placement for Elliott at Trinity High School ("Trinity"), a non-residential placement at a high school close to the Cones' residence in Randolph County. PATH was not presented as an option because the Cones had indicated their opposition to placing Elliott in any facility but Benedictine. No consensus was reached on the draft IEP. The IEP team reconvened on October 10, 2005, and the draft IEP was finalized to provide services at Trinity for Elliot from October 2005 through May 6, 2006 (the "October IEP"). The

8

Cones, their advocates, and PATH representatives objected to this placement and refused to sign the October IEP.

On October 11, 2005, the Cones filed a due process challenge to the October IEP. Eventually, starting October 31, 2005, the Cones placed Elliott at Trinity. But Elliott's stay was short-lived as the Cones withdrew him seven days later on the grounds that the placement, which was not residential, was unacceptable.

On April 18, 2006, the ALJ issued a decision in favor of the Cones, concluding that the October IEP was flawed because Trinity did not provide a FAPE to Elliot. (Doc. 1, Ex. 1-3 at 22.) The ALJ concluded that RCS was obliged to pay Elliott's tuition at Benedictine from May 6, 2005, through October 13, 2005. (Id. at 24.) The ALJ also ordered that Elliott be placed at Benedictine, at RCS' expense, until a space at PATH became available. (Id.) In addition, the ALJ awarded the Cones attorneys' fees and costs. (Id.)

The SRO reviewed the ALJ's decision and on May 27, 2006, affirmed in part and reversed in part. (Doc. 1, Ex. 1-2 at 26.) The SRO concurred with the ALJ that the October IEP placing Elliott at Trinity did not provide a FAPE, although the SRO concluded that placement at Trinity could conceivably provide a FAPE but not under the October IEP. (Id.) The SRO also affirmed the ALJ's conclusion that RCS was obliged to pay

9

Benedictine tuition beyond May 6, 2005, but only through July 2005, not October 2005.  (Id.)  The SRO overturned the ALJ's award of attorneys' fees and costs, noting such relief can only be granted by a court.  (Id.)

On June 30, 2006, the Cones brought the present action to obtain, in part, a review of the SRO's decision.  (Doc. 1.)  On October 20, 2006, this court denied two of the Cones' claims seeking (1) an order that Elliott's "stay put" placement under 20 U.S.C. § 1415(j) entitled him to stay at Benedictine past May 5, 2005, until a place was available at PATH and (2) a preliminary injunction placing Elliott at a residential placement at Benedictine.  (Doc. 24.)

Presently before the court on cross motions for summary judgment are the Cones' remaining requests for an order requiring RCS to pay (1) Elliott's tuition at Benedictine after May 5, 2005, and (2) reasonable attorneys' fees and costs related to the administrative proceeding challenging the October IEP.  (Doc. 31.)  RCS, through its Answer, Counterclaim, and motion, seeks an order finding that (1) RCS properly ceased payment for services at Benedictine after May 5, 2005, following the Cones' refusal to cooperate with the implementation of the PATH placement and (2) RCS offered Elliott a FAPE through the

10

October IEP.  (Docs. 16, 33.)[6]  On February 5, 2009, the court
heard oral argument on the motions for summary judgment.

## II. ANALYSIS

Generally, summary judgment is appropriate where an
examination of the pleadings, affidavits, and other proper
discovery materials demonstrates that there is no genuine issue
as to any material fact and that the moving party is entitled to
judgment as a matter of law.  See Fed.R.Civ.P. 56(c); Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  When a party
files a motion for summary judgment challenging a state
administrative ruling under the IDEA, the motion "may more aptly
be described . . . as a motion for summary adjudication."
Hanson ex rel. Hanson v. Smith, 212 F. Supp. 2d 474, 480 (D. Md.
2002) (citing Cavanagh v. Grasmick, 75 F. Supp. 2d 446, 457 (D.
Md. 1999)).  In reviewing the factual findings in an

---

[6] RCS argues that its motion for summary judgment should be treated as
unopposed because the Cones filed their opposition brief (Doc. 36) on
July 12, 2007, outside the period specified by this court's local rule
7.3(f).  (Doc. 39, at 2-3.)  The Cones assert that they filed timely
in reliance on the court's Electronic Document Filing System, which
set July 12, 2007, as the deadline.  (Doc. 40; see Doc. 43.)  To be
sure, the Cones' filing on July 12, 2007, did not comply with local
rule 7.3(f).  However, because the clerk's docket entry, upon which
counsel relied, mistakenly set the response date, the court finds that
excusable neglect exists in this case.  LR7.3(k); Hilton Groups, PLC
v. Branch Banking & Trust Co. of South Carolina, No. 2:05-937-DCN,
2007 WL 2022183, at *3-4 (D.S.C. July 11, 2007) (advice of deputy
clerk substantially affected counsel's interpretation of rule) (citing
Combustion Eng'g, Inc. v. Miller Hydro Group, 739 F. Supp. 666, 668-69
(D. Me. 1990)).  Notwithstanding this ruling, it remains the duty of
attorneys to independently verify due dates, which must be calculated
under the rules of civil procedure, including local rules.

administrative decision, therefore, the court is charged with making its own determinations based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii); <u>J.P. ex rel. Peterson v. County Sch. Bd. of Hanover County</u>, 516 F.3d 254, 258-59 (4th Cir. 2008). However, the court is also required to "receive the records of the administrative proceedings," 20 U.S.C. § 1415(i)(2)(C)(i), "an obligation that carries with it the implied requirement that due weight shall be given to these proceedings." <u>Peterson</u>, 516 F.3d at 259 (internal quotation marks omitted) (quoting <u>Rowley</u>, 458 U.S. at 206); <u>G. ex rel. Ssgt R.G. v. Fort Bragg Dependent Sch.</u>, 343 F.3d 295, 302 (4th Cir. 2003). This standard requires the court to conduct a modified de novo review, to assume findings of fact made in the administrative proceedings prima facie correct, and, if it fails to adhere to them, to explain why. <u>Fort Bragg</u>, 343 F.3d at 302; see <u>Doyle v. Arlington County Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir. 1991).[7]

Where the administrative proceedings are two-tiered and both the ALJ and SRO reach the same conclusion, their findings are accorded greater deference. <u>Fort Bragg</u>, 343 F.3d at 302-03 (citing <u>Combs v. Sch. Bd. of Rockingham County</u>, 15 F.3d 357, 361

---

[7] This deference is limited to factual findings. This court, therefore, must make an independent, de novo determination of the IDEA's legal requirements. <u>Fitzgerald v. Fairfax County Sch. Bd.</u>, 556 F. Supp. 2d 543, 550 (E.D. Va. 2008); <u>Alexis v. Bd. of Educ. for Baltimore County Pub. Sch.</u>, 286 F. Supp. 2d 551, 556 (D. Md. 2003).

(4th Cir. 1994)). "[T]he district court must defer to the SRO's credibility determinations," and the SRO must defer to the credibility determinations of the ALJ. <u>CM ex rel. JM v. Bd. of Pub. Educ. of Henderson County</u>, 184 F. Supp. 2d 466, 470 (W.D.N.C. 2002). In no event should the courts "substitute their own notions of sound educational policy for those of local school authorities." <u>Hartmann v. Loudoun County Bd. of Educ.</u>, 118 F.3d 996, 999 (4th Cir. 1997). The burden of proof falls on the party challenging the administrative ruling. <u>Barnett ex rel. Barnett v. Fairfax County Sch. Bd.</u>, 927 F.2d 146, 152 (4th Cir. 1991).[8] In this case, the Cones and RCS assert challenges to the administrative ruling. Thus, the burden of proof is allocated accordingly.

### A. Tuition Reimbursement

The Cones contend that they are entitled to tuition reimbursement for Elliott's enrollment at Benedictine from May 6, 2005, through the ESY session in July, as well as for his attendance in September through October 13, 2005. RCS argues that the Cones are not entitled to reimbursement after Elliott's last IEP executed under section 1415(j) expired on May 5, 2005.

The IDEA provides for parental reimbursement of any private placements if (1) the school district fails to provide a FAPE

---

[8] <u>Cf. Schaffer ex rel. Schaffer v. Weast</u>, 546 U.S. 49, 62 (2005) ("The burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.").

and (2) the parental placement is appropriate.  <u>M.S.</u>, 553 F.3d at 323-24 (internal citation omitted).

### 1.   May 6 through July 2005

When the Supreme Court denied certiorari review of Elliott's previous case on January 25, 2005, Elliott remained enrolled at Benedictine under an IEP that was effective from May 7, 2004, through May 5, 2005.  On March 24, 2005, RCS' attorney sent Elliott's father a letter memorializing their prior telephone conversation that discussed "mov[ing] forward with the PATH placement" in light of the exhaustion of judicial review of this court's prior ruling.  (A.R., Respondent's Ex. 3.)  Although RCS included a PATH application, its letter failed to indicate when it had to be submitted, noting only that it "will need to be completed."  (<u>Id.</u>)  On April 22, 2005, RCS' attorney wrote the Cones' counsel, noting that RCS was moving toward implementing placement at PATH and that the application she had provided to the Cones needed to be completed and signed as soon as possible.  (A.R., Respondent's Ex. 5.)

As this court ruled on October 20, 2006, Elliott's "stay put" placement at Benedictine expired at the end of the ESY program in July 2005.  (Doc. 24 at 9-12.)  The court's conclusions of law held, in part, that "[b]ecause Plaintiffs unilaterally chose Benedictine as a private placement for Elliot, refused consent to educational services by intentionally

14

delaying the PATH application process, and made no agreement with the state as to pendent placement, Elliott had no 'stay put' placement by the end of July 2005." <u>Cone v. Randolph County Schools Bd. of Educ.</u>, No. 1:06CV00579, 2006 WL 3000445, at *6 (M.D.N.C. Oct. 20, 2006).

Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." <u>United States v. Lentz</u>, 524 F.3d 501, 528 (4th Cir. 2008) (internal quotation marks and citation omitted), <u>cert</u>. <u>denied</u>, 129 S. Ct. 303 (2008); 18B Wright, Miller & Cooper, <u>Federal Practice and Procedure: Jurisdiction 2d</u> § 4478 at 638-40 (2d ed. 2002) ("[Law of the case rules] govern within a single action . . . [and] do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment."). The court finds no grounds to disregard the October 20, 2006, "stay put" ruling and therefore finds that RCS' attempt to revisit it in contesting tuition reimbursement through July 2005 should be rejected.[9]

---

[9]  The court acknowledges that when the "initial ruling is one made in connection with a motion for a preliminary injunction, it is less likely to be considered the law of the case." <u>Market America, Inc., v. Rossi</u>, No. 1:97CV00891, 1999 WL 1939247, at *6 (M.D.N.C. Apr. 15, 1999) (citing cases). In this court's October 20, 2006, ruling, however, the determination of whether the "stay put" placement continued was not a preliminary ruling or prediction of the outcome of the issue or one undertaken by the court without a full review of matters relating to the issue itself. Rather, the "stay put" determination finally decided the issue and is entitled to law-of-the-case treatment. Further, as noted immediately below, even without

This conclusion is also consistent with the SRO's determination that RCS should pay for Benedictine through July 2005. (Doc. 1, Ex. 1-2 at 17.) As the product of the final decision-maker, the SRO's factual findings that are regularly made should be presumed correct unless the SRO acts "so far from the accepted norm" that due weight should be given to the ALJ on the credibility determinations. See Doyle, 953 F.2d at 104-05 (officer reviewing the hearing officer's findings violated the accepted norms of the fact-finding process by rejecting, on review of a cold record, the testimony of a witness that the hearing officer had found credible, simply because the reviewing officer believed that the witness was acting as an advocate).

RCS has an obligation to provide a FAPE to Elliott. 20 U.S.C. § 1412(a)(1). It could not have done so if it could not provide placement for Elliott at PATH upon the termination of the IEP on May 6, 2005. PATH applications are processed on a quarterly basis. (A.R., Tr. at 1471.) The record contains evidence that a PATH application begun at or around the April IEP meeting could not have been prepared and submitted by May 5 or by the May 26, 2005, letter from RCS to the Cones' attorney. (A.R., Tr. at 1473.) RCS has not presented evidence to the contrary. The SRO's finding that the PATH "application could

_____

consideration of a "stay put," it has not been shown that a place for Elliott was available at PATH during this period.

16

have been completed by the end of the summer, at the very latest" (Doc. 1. Ex. 1-2 at 14), does not shed light on the availability of PATH upon the expiration of Elliott's previous IEP. In any event, RCS has not shown that an opening at PATH was available to Elliott immediately upon the expiration of Elliott's IEP on May 6, 2005.[10] Moreover, reimbursement of tuition through the July 2005 ESY session is further supported by the SRO's finding that Elliott's previous IEPs had included ESY services. (Doc. 1, Ex. 1-2 at 15.) Thus, the court concludes that, giving due weight to the administrative finding of facts, the preponderance of the evidence demonstrates that the Cones are entitled to reimbursement through July 2005 in the amounts of $11,822.97 for May 2005, $7,728.27 for June 2005, and $11,073.50 for July 2005.[11]

### 2. September through October 13, 2005

The Cones also move for reimbursement of tuition for September through October 13, 2005, in the amount of $13,516.00. (Doc. 31 at 2; Doc. 1, Ex. 1-2 at 12.) The Cones argue that RCS failed to meet its burden of providing a FAPE to Elliott during

---

[10]   RCS points to the fact that in the Spring of 2001, when it initially proposed placement at PATH, an opening was available. (A.R., Tr. at 2579-80.) That is too remote for the determination of whether PATH was available four years later after RCS terminated funding for Elliott at Benedictine.

[11] For the reasons noted above, the court need not reach RCS' challenge to the SRO's finding that RCS failed to provide adequate notice to the Cones under 20 U.S.C. § 1415(b)(3)(A).

this period. RCS contends that the Cones forewent any entitlement to reimbursement because they withdrew consent for educational services by delaying and frustrating the PATH application process.

The Cones delayed their PATH application until September 14, 2005. This was nearly eight months after the Supreme Court denied certiorari in their challenge to this court's order holding that PATH provided Elliott a FAPE and almost six months after RCS sent the Cones the PATH application. Indeed, the Cones had already gone ahead and enrolled their son in Benedictine before completing their PATH application. With their application they also included a thirteen-page letter that included a section entitled "Plea to Allow Elliott to Stay at Benedictine," which detailed multiple reasons why Elliott should remain at Benedictine and not be admitted into PATH. (A.R., Petitioner's Ex. 19.) Instead of requesting a position for Elliott, therefore, the Cones' application encouraged *denial* of PATH placement for Elliott. (A.R., Petitioner's Exs. 19, 24.)

This court has already concluded that the Cones' unilateral selection of Benedictine as a private placement for Elliott and their refusal to consent by intentionally delaying the PATH application process left Elliott without a "stay put" placement after July 2005, Cone, 2006 WL 3000445, at *5, and this holding is consistent with the SRO's conclusion (Doc. 1, Ex. 1-2 at 26).

18

This court has also previously determined that the Cones' "refusal to cooperate with implementation of the PATH placement also constituted a refusal to consent to receive special education and related services under IDEA. When parents refuse to consent to such services, the school district no longer has an obligation to provide FAPE to the child." Cone, 2006 WL 3000445, at *5 (citing 20 U.S.C. § 1414(a)(1)(D)(ii)(II)).[12] This conclusion is also consistent with the Fourth Circuit's decision in MM v. School District of Greenville County, where it concluded that "the [district] court properly concluded that 'it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation.'" 303 F.3d at 535. Thus, this court concludes,

---

[12] On July 1, 2005, amendments to the IDEA, including the provision concerning consent to services, became effective. Amendments to the IDEA are not applied retroactively. Emery v. Roanoke City Sch. Bd., 432 F.3d 294, 297 n.1 (4th Cir. 2005) ("Because the relevant conduct in this case occurred before the amendments were in place, we only discuss the earlier IDEA sections."); accord Lawrence Township Bd. of Educ. v. New Jersey, 417 F.3d 368, 370 (3d Cir. 2005). Therefore, the court examines the consent for services provision only with respect to conduct occurring after July 1, 2005. It is true that the IDEA sub-subsection cited in the court's October 2006 opinion appears under a subsection titled "Initial evaluations," but the consent to services clause itself contains no restriction to initial services. Further, even before the 2005 amendments, the U.S. Supreme Court held that equitable considerations are relevant in fashioning relief in cases such as this. School Comm. of Town of Burlington, Mass. v. Dept. of Educ. of Mass., 471 U.S. 359, 366–67 & 374 (1985) ("We do think that the court [of appeals] was correct in concluding that 'such relief as the court determines is appropriate,' within the meaning of § 1415(e)(2) [counterpart to current 20 U.S.C. § 1415(i)(2)(C)(iii)], means that equitable considerations are relevant in fashioning relief.").

Case 1:06-cv-00579-TDS-PTS   Document 45   Filed 09/22/09   Page 19 of 35

consistent with the SRO's conclusion (Doc. 1, Ex. 1-2 at 26),
that the parents' conduct, including the PATH letter,
constitutes a withdrawal or refusal of consent (particularly in
the face of this court's prior conclusion that PATH provided
Elliott a FAPE), and Elliott's placement at Benedictine in
September and October of 2005 was a unilateral private school
placement for which the Cones are not entitled to
reimbursement.[13]   To this extent, their motion for summary
judgment is denied, and RCS' motion is granted.

### B.   October IPE and Placement at Trinity High School

RCS seeks summary judgment on its Counterclaim that the
October IEP with placement at Trinity provided Elliott a FAPE.
Both the ALJ and the SRO found that the October IEP failed to do
so.  (Doc. 1, Ex. 1-2 at 21-22, 26; Doc. 1, Ex. 1-3 at 12, 24.)[14]

---

[13]   Reimbursement may also be reduced or denied "upon a judicial
finding of unreasonableness with respect to actions taken by the
parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(III).   An "unreasonable
obstruction of an otherwise promising IEP process fully justifies a
denial of reimbursement under the IDEA." C.G. v. Five Town Community
School Dist., 513 F.3d 279, 288 (1st Cir. 2008) (finding that parents'
harboring of fixed purpose to effect a residential placement at school
district expense through parents' obstruction of IEP was
unreasonable).   The SRO observed accurately that the Cones acted as if
this court never ruled that PATH provided Elliott a FAPE in the
previous litigation.   (Doc. 1, Ex. 1-2 at 8-9.)   The court finds
alternatively, therefore, that the Cones' foot-dragging and continued
resistance to the process constituted "unreasonableness" under section
1412(a)(10)(C)(iii)(III).   M.S. v. Mullica Tp. Bd. of Educ., 485 F.
Supp. 2d 555, 568 (D.N.J. 2007) (denying reimbursement because parents
failed to cooperate in completion of IEP), aff'd, 263 F. App'x 264 (3d
Cir. 2008).

[14]   Following his removal from Trinity, Elliott remained at home with
his parents for some period of time.   According to the Cones, Elliott

Both essentially concluded that Trinity was a non-residential program which, given the extensive nature of Elliott's disabilities, was not "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 207; (see Doc. 1, Ex. 1-2 at 16-17; Doc. 1, Ex. 1-3 at 11-15.) The ALJ was "convinced that at this point in time Elliott must receive educational services in a residential setting if he is to obtain an appropriate education under IDEA." (Doc. 1, Ex. 1-3 at 4, 13, 22, 23.) The SRO, while not ruling out that placement at Trinity might conceivably be appropriate if additional conditions existed, stated:

> The IEP was still flawed. It did not address the application of consistent educational strategies across all environments. Because of his disability, [Elliott] definitely needed this consistency that had been provided in the residential placement at Benedictine. . . . The non-residential placement at Trinity needed to have very specific components in the IEP to work with the home environment to insure this consistency. . . .
>
> [Elliott's] educational program, however, must extend beyond regular school hours. His serious disabilities require educational activities to be conducted in all environments. The program failed in that it did not have those components to cooperate with the home to provide the consistency across all environments. Such components would be difficult to develop and manage, but they are conceivably possible in a non-residential placement for a child such as [Elliott]. Although a residential program is preferred, it is not absolutely required for [Elliott] to be successful. The

re-entered the residential program at Benedictine in January 2007 with the North Carolina Medicaid Program bearing the full cost of placement. (Doc. 32 at 2 n.1.)

> placement at Trinity has the potential for providing
> FAPE, though not without additional components added
> to the October 10 IEP.

(Doc. 1, Ex. 1-2 at 9-12 (Findings of Fact) & 16-17 (Discussion); see Doc. 1, Ex. 1-2 at 21-22 (Conclusions of Law) & 26 (Decision).)

In reviewing a state administrative proceeding, courts apply a two-step inquiry and determine first whether the state complied with the IDEA's procedural requirements and, if so, whether the IEP is reasonably calculated to enable the child to receive educational benefits. Cone, 302 F. Supp. 2d at 506; Rowley, 458 U.S. at 206-207. Whether an IEP is substantively appropriate is a factual question that this court must answer based on the preponderance of the evidence, giving due weight to the administrative proceedings. Peterson, 516 F.3d at 258-59. "Due weight" means that findings of fact made in the state administrative proceedings must be considered prima facie correct, "akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." Id., at 259 (quoting Doyle, 953 F.2d at 105). Here, because the ALJ and SRO reached the same conclusion, greater deference to their findings is warranted. MM, 303 F.3d at 531 (citing Combs, 15 F.3d at 361).[15]

---

[15] Although the ALJ and SRO concluded that the October IEP and placement at Trinity did not provide a FAPE to Elliott, the underlying grounds differed, as noted above. Further, the SRO determined he had

Neither party asserts any deficiency in meeting the IDEA's procedural requirements with respect to the October IEP (although, as addressed below, RCS argues that the SRO's decision requires RCS to include in the IEP information beyond that required by the IDEA). Thus, the court turns to the substantive question of whether the October IEP and its placement of Elliott at Trinity is reasonably calculated to enable Elliott to receive educational benefits.

First, RCS argues that, contrary to the SRO's conclusion, the IDEA does not require an IEP to include components addressing application of consistent educational strategies across all environments or to provide for "effective communications" between the school and the home; therefore, it contends, the SRO's finding was incorrect. (Doc. 34 at 15-16.) RCS points to 20 U.S.C. § 1414(d)(1)(A)(i), which specifies the information required in a written IEP and argues that the ALJ and SRO erred by improperly grafting onto it extra-statutory requirements in violation of subsection (d)(A)(ii)'s prohibition

no choice but to "independently determine the facts from the record" because he concluded that the ALJ's opinion was written by the Cones and included only the Cones' version of the facts. Some of the facts, the SRO opined, were "clearly contradicted by the record," and facts established by RCS' witnesses and cross-examination of the Cones' witnesses were not included in the ALJ's decision. (Doc. 1, Ex. 1-2 at 4.) The SRO, however, stated that due weight was given the ALJ's decision, "although it was very difficult." (Doc. 1, Ex. 1-2 at 23.) The SRO's concern is well-taken. Consequently, the court has reviewed specific findings in the ALJ's and SRO's decisions as well as the administrative record.

against requiring additional information in an IEP "beyond what is explicitly required in this section." (Doc. 34 at 14-15.) RCS relies only on <u>MM</u>, <u>supra</u>, 303 F.3d at 527, which simply lists the general requirements of section 1414(d)(1)(A)(i).[16] (Doc. 34 at 14.) The Cones do not directly address this argument, focusing instead on whether the ALJ and SRO appropriately found, based on the record evidence, that the IEP was deficient because it failed to adequately address Elliott's educational needs. (Doc. 36, at 8-20.)

The IDEA describes what must be included in an IEP, but only in general terms. For example, an IEP must include a statement of the special education, related services, and supplementary aids and services that will be provided to the student as well as the frequency, location and duration of those services. 20 U.S.C. § 1414(d)(1)(A)(i)(IV) & (VII). Services required are necessarily specific to the individual student given the nature of the "Individualized Education Plan." The SRO found that Elliott's specific needs are appropriately met in a residential setting but that such a setting was not "absolutely necessary." (Doc. 1, Ex. 1-2 at 21-22, 26.) However, by placing Elliott in a non-residential setting at Trinity, the SRO found, certain compensatory services were

---

[16] This is not surprising given that the limiting statutory language upon which RCS relies was added after <u>MM</u> was decided.

necessary to address Elliott's need for consistency across his environments in order for the IEP to provide Elliott a FAPE. (Doc. 1, Ex. 1-2 at 10, 16, 21-22, 26.) Such a conclusion is not extra-statutory to section 1414(d)(1)(A)(ii), as RCS claims. Rather, the SRO's determination constituted a reasonable assessment that the services that the October IEP set out for Elliott were not reasonably calculated to provide a FAPE, and the court so finds.

Second, RCS argues that the SRO erred in concluding that the October IEP must "address the application of consistent educational strategies" because "the use of a particular methodology (or the consistency with which a methodology is used) is not for the courts to determine." (Doc. 34 at 16.) RCS cites Barnett, supra, for the proposition that courts "have repeatedly found that educational methodology is to be left to the educators." (Doc. 34 at 16.)

Barnett, however, illustrates why the SRO's challenged findings do not fall under this approach. In Barnett, a hearing-impaired student and his parents challenged the school board's authority to centralize a "cued speech" program at a school a few miles farther from the student's home than his base school, at which the parents and student sought a duplicate program. The court noted that "the choice of the particular methodology employed is left to the school system" and concluded that

25

whether "a particular service or method can feasibly be provided in a specific special education setting is an administrative determination" that state and local officials were better qualified and situated to make. Barnett, 927 F.2d at 151–52. Barnett confirmed that, although details including methodology are left to state and local officials, this does not diminish the IDEA's requirement that the education itself be responsive to the needs of the child. Id. at 152. In the present case, by contrast, it is not simply the methodology of providing a particular service to Elliott that is at issue; rather, the ALJ and SRO found that the October IEP's education plan for Elliott was not appropriately responsive to his needs.

RCS also relies on Tice, supra, for the proposition that "[o]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second[-]guess the judgment of education professionals." (Doc. 34 at 16.) Tice was quick to note that such deference is required but only "so long as an IEP provided the child 'the basic floor of opportunity that access to special education and related services provides.'" Tice, 908 F.2d at 1207. The "basic floor," according to the Supreme Court, "consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Rowley, 458 U.S. at 201–02 (noting that

determination of whether the child receives sufficient educational benefits "presents a more difficult problem"). The SRO applied this standard. (See Doc. 1, Ex. 1-2 at 22-23 (citing Tice).) Further, the Fourth Circuit subsequent to Tice noted that the required deference to the opinions of professional educators does not "somehow relieve the hearing officer or the district court of the obligation to determine as a factual matter whether a given IEP is appropriate." County Sch. Bd. of Henrico County, Va. v. Z.P., 399 F.3d 298, 307 (4th Cir. 2005) ("To give deference only to the decision of the School Board would render meaningless the entire process of administrative review.").

Here, the evidence in the record supports the ALJ's and SRO's conclusion that the October IEP and Trinity placement did not provide Elliott with a FAPE. Dr. Gail Spiridigliozzi, from the Fragile X Clinic at Duke Medical Center, testified for the Cones before the ALJ that although she thought the October IEP was appropriate for Elliott, Trinity was not an appropriate setting for Elliott because his "needs are quite extensive, and they require a great deal of structure and consistency across the entire day and a minimal amount of transitions for [Elliott], and I think his needs are best met in some sort of

24-hour residential program."[17]  (A.R., Tr. at 741, 796-97, 802-03.)  Although she acknowledged not having personally visited Trinity, she stated that a visit would not change her mind since she has been to similar programs in other high schools and it is her opinion that "a residential school is most appropriate to meet the needs that [Elliott] presents." (A.R., Tr. at 804.)

Dr. Ave Lachiewicz, also one of the Cones' experts from the Fragile X Clinic at the Duke Medical Center, interacted with Elliott in 1993, 1998, 2001 and 2006.  (A.R., Tr. at 111, 161-62.)  In her testimony before the ALJ, Dr. Lachiewicz testified that she thought, overall, that the October IEP "pretty much" serves Elliott's educational needs.  (A.R., Tr. at 154.)  She testified, however, "I think he needs to be in a residential placement" and opined that it was not appropriate to place him in a non-residential setting.  (A.R., Tr. at 158.)  She, too, bases her opinion that Trinity is not an appropriate placement for Elliott on the fact that Elliott needs to be in a residential placement.  (A.R., Tr. at 177-78.)  Specifically, she noted that Elliott has difficulty with simple transitions, such as getting on a bus to and from school.  (A.R., Tr. at 187-88.)  Therefore, a residential setting that minimizes the number

---

[17]  Congress did not intend to guarantee the best education that money could buy.  A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004) (citing Rowley, 458 U.S. at 189).  The record, however, reveals that the October IEP and Trinity placement did not provide Elliott with "a satisfactory level of educational opportunity."  See id.

of transitions, she concluded, is more appropriate. (A.R., Tr. at 186-88.)

RCS' expert, Dr. Gary Mezibov, also agreed that more consistency in the information and techniques used with Elliott is beneficial to those with his condition. (A.R., Tr. at 2698-99.) He explained that residential programs provide for greater integration of educational goals for individuals like Elliott than do non-residential settings like Trinity. (A.R., Tr. at 2698.) Dr. Mezibov acknowledged that he had previously testified that Elliott did not fit into a non-residential structure and thus needed the kind of structure found in PATH's residential program. (A.R., Tr. at 2738.)

Although the decisions of the SRO and ALJ do not agree on a number of factual findings, the administrative record makes clear that both decisions were in agreement as to the issues key to determining whether the October IEP with placement at Trinity provided a FAPE to Elliott: (1) a FAPE for Elliott needed the application of consistent educational strategies across all environments (Doc. 1, Ex. 1-2 at 10, 16, 21-22 (SRO); Doc. 1, Ex. 1-3 at 22 (ALJ)); (2) because of his disability, Elliott needed the consistency that had been provided at Benedictine (Doc. 1, Ex. 1-2 at 16, 21-22 (SRO); Doc. 1, Ex. 1-3 at 22 (ALJ)); and (3) all evidence concerning Elliott and his disabilities indicates that he also needs a plan to manage

transitions from one activity to another and one setting to another (Doc. 1, Ex. 1-2 at 10 (SRO); Doc. 1, Ex. 1-3 at 12 (ALJ)). The SRO also found that RCS failed to provide Elliott a FAPE because there was no effective communications strategy between the school and home. (Doc. 1, Ex. 1-2 at 10, 16).[18]

District courts are strictly cautioned not to "substitute their own notions of sound educational policy for those of local school authorities." Hartmann, 118 F.3d at 999. Applying the deference owed to the administrative findings, particularly in this two-tiered review system where both the ALJ and SRO concluded that the October IEP with placement at Trinity did not provide a FAPE, this court finds as well that the preponderance of the evidence demonstrates that the October IEP and placement of Elliott at Trinity did not provide Elliott a FAPE.[19] Thus, RCS' motion for summary judgment on this ground is denied.[20]

---

[18] The ALJ did not consider the communications strategy because he concluded that a residential placement was required.

[19] The Cones submitted documents in support of their motion for summary judgment, including the affidavits of Tara Larson and Nancy McCloy. (Doc. 31, Ex. 2, Ex. 4.) RCS objects to the inclusion of these affidavits on several grounds, including relevancy, hearsay, ability of affiants to have testified at the administrative hearing, and that the court had not granted a request for submission of additional evidence under 20 U.S.C. § 1415(i)(2)(C). (Doc. 35 at 5-7.) The Cones assert that the affidavits provide evidence that Trinity was insufficient insofar as Elliott relapsed after his placement there. (Doc. 37 at 9-10.) In light of the court's ruling that the October IEP and Trinity placement did not provide a FAPE, the court need not resolve the dispute and has not considered the affidavits.

[20] The court does not hold that RCS could never have provided Elliott a FAPE through Trinity, only that it did not do so on this record.

30

**C. Plaintiffs' Entitlement to Attorneys' Fees as the Prevailing Party**

The court's findings and conclusions set out above resolve all issues in this litigation except for the Cones' request for attorneys' fees and costs. The Cones seek attorneys' fees and costs in the amount of $91,475.00 based on their contention that they are a "prevailing party." (Doc. 32 at 12.) RCS contends that the motion is premature absent final judgment and that, even so, the Cones are not prevailing parties inasmuch as the October IEP and Trinity placement was appropriate.

Courts have discretion to "award reasonable attorneys' fees as part of the costs -- to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). In Buckhannon Bd. & Care Home, Inc. v. W. Va. Department of Health & Human Resources, 532 U.S. 598 (2001), a case brought under the Fair Housing Amendments Act and the Americans with Disabilities Act, the Supreme Court held that a prevailing party "is one who has been awarded some relief by a court." 532 U.S. at 603-04 (noting a judgment or court-ordered consent decree creates the "material alteration of the legal relationship of the parties" necessary to permit an award of attorneys' fees). This definition applies to the IDEA. Combs, 15 F.3d at 360 (applying case cited in Buckhannon in IDEA context); Fort Bragg, 343 F.3d at 310 (applying Buckhannon and case cited by it in

31

IDEA context); accord Bush ex rel. A.H. v. Dist. of Columbia, 579 F. Supp. 2d 22, 26 (D.D.C. 2008). See Buckhannon, 532 U.S. at 602-03 (noting that the Court has interpreted "prevailing party" fee-shifting statutes consistently).

When the Cones initiated the October 11, 2005, due process hearing, they were challenging, among other things, whether the October IEP and placement at Trinity provided a FAPE and sought to receive tuition reimbursement for Elliott's placement at Benedictine from May 6, 2005 through October 2005.[21]

A litigant is a prevailing party for purposes of an attorneys' fees award if "they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Bd. of Educ. of Frederick County v. I.S. ex rel. Summers, 358 F. Supp. 2d 462 (D. Md. 2005) (internal quotation marks and citation omitted) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). Receipt of nominal damages may suffice to support prevailing party status. Buckhannon, 532 U.S. at 604; Fort Bragg, 343 F.3d at 310 (holding that parents who were awarded over $11,000 in reimbursement for expenses satisfied the requirements of a prevailing party). This court's determination that the Cones

---

[21]    Although the evidence supports an inference that the Cones' ultimate goal was to keep Elliott at Benedictine, the issues raised in the Cones' October 11, 2005, due process challenge were related to the October IEP, Elliott's placement at Trinity, and tuition reimbursement for the period from May 6 through October 13, 2005.

are entitled to reimbursement through July 2005 supports a finding that they achieved success on a significant issue and obtained more than nominal damages. Thus, the court concludes that the Cones are a prevailing party and grants them leave to move for attorneys' fees and costs.[22]

To be sure, although the Cones achieved these successes, they achieved only partial success on their tuition claim. "Partial success does not necessarily preclude an award of attorneys' fees, but an award may be reduced for unsuccessful claims." Kirkpatrick v. Lenoir County Bd. of Educ., No. 4:97-CV-168-BO(1), 1999 WL 1939984, at *7 (E.D.N.C. Mar. 31, 1999). Where it is difficult to separate the successful from the unsuccessful claims, district courts are instructed to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Hensley v. Eckerhart, 461 U.S. 424, 435 (1983).

---

[22] This is not a case in which a plaintiff brought an action under the IDEA solely seeking attorneys' fees incurred in an administrative proceeding in which the plaintiff prevailed. Rather, this court is called upon to review the underlying administrative decision in addition to determining a fee award, if any. In such cases, the proper means to seek attorneys' fees is through a timely motion under Fed.R.Civ.P. 54(d). DeKalb County Sch. Dist. v. J.W.M., 445 F. Supp. 2d 1371, 1379 (N.D. Ga. 2006), citing, as accord, Dist. of Columbia v. R.R., 390 F. Supp. 2d 38 (D.D.C. 2005); Traverse Bay Area Intermediate Sch. Dist. v. Michigan Dept. of Educ., No. 5:06-CV-139, 2007 WL 2219352, at *17-18 (W.D. Mich. July 27, 2007) (citing cases). See DiBuo v. Bd. of Educ. of Worcester County, 309 F.3d 184, 185 & 192 (4th Cir. 2002) (remanding but expressing no opinion on attorneys' fees and other costs in event plaintiffs "have the opportunity to make another motion under IDEA's fee-shifting provision").

The Cones' entitlement to attorneys' fees related to their challenge of the October IEP is less clear. Granted, they prevailed in this court in opposing RCS' Counterclaim and motion for summary judgment that sought a finding that the October IEP provided a FAPE to Elliott. However, their due process challenge to the October IEP, which was the foundation for the Counterclaim, appears to have been unnecessary had the Cones abided by this court's prior determination (from the Cones' prior litigation) that PATH provided Elliott a FAPE. Thus, should the Cones seek recovery of attorneys' fees related to the October IEP, the parties should brief the issue of their entitlement, and any award of fees to the Cones may be reduced or modified accordingly.

## III. CONCLUSION

For the reasons set forth above, IT IS THEREFORE ORDERED that:

1. The Cones' motion for summary judgment seeking recovery for Benedictine tuition payments (Doc. 31) and RCS' motion for summary judgment seeking an order denying the same (Doc. 33) are GRANTED IN PART AND DENIED IN PART. The Cones shall have and recover of RCS tuition payments to Benedictine for services rendered to Elliott from May 6, 2005, to the end of the ESY program in July 2005 in the following amounts: $11,822.97 for the remainder of May 2005; $7,728.27 for the

34

month of June 2005; and $11,073.50 for the month of July 2005. To the extent that the Cones have not made payments to Benedictine for the period from May 6, 2005, through July 2005, RCS shall make the payment directly to Benedictine.

2. RCS' motion for summary judgment seeking a ruling that the SRO's decision that RCS' October 10, 2005, IEP failed to provide a FAPE to Elliott was erroneous (Doc. 33) is DENIED, and RCS' Counterclaim is DISMISSED WITH PREJUDICE.

3. The Cones are a "prevailing party" and are granted sixty (60) days within which to apply for attorneys' fees and costs pursuant to Fed.R.Civ.P. 54(d). RCS shall have twenty (20) days to respond. The parties are reminded to consult local rule 54.2 for its procedural requirements before filing any motion.

A judgment effectuating this order will be entered contemporaneously.

                                    /s/ Thomas D. Schroeder
                                    United States District Judge

September 22, 2009